Undisputed on this appeal is the fact that Dr. Phillips of the University of Missouri was the first to invent an uncoated, solid dosage form of a PPI as claimed in the patents. The principal issue is obviousness, a question of law that is informed by three major factual issues that are largely, or should be, not in dispute. The scope and content of the prior art, differences between the art and the claimed inventions, and the level of ordinary skill. So what is the scope and content of the prior art and the differences? There are three major groupings of prior art. The first is prior art that addresses solid dosage forms of PPI, plainly the most relevant group. Are you talking about Lammers and Pilbrant, for example? Those are part of the prior art. I would put them into the second category, which would be liquid prior art, which I'll get to in just a moment. So you were talking about Makino and Yamasaka. The third area of prior art, which I will also get to, includes stability prior art. And the Court's questions, both of the Court's questions, are understandable, because the key solid dosage prior art, as well as the prior art as a whole, which is the important legal test, teach a way, teach a way in a pointed manner from Dr. Phillips' claim of invention. Lammers and Pilbrant are clearly teaching that you can combine the sodium bicarbonate with premazol, right? Yes. They just did. Why wouldn't one of skill in the art say that if you can do this in a liquid formulation with benefit, why not just wrap tums around the premazol? Because one needs to, as this Court's decisions inform us, look at the prior art as a whole, and the District Court failed to look at the strong teachings of that first group of solid dosage prior art, which state and state consistently that PPIs must, must be enteric coated. So someone reading the prior art as a whole, not just one piece in isolation, would come away with that. How does the 737 patent fit into that body of prior art? Well, the 737 patent is claiming either suspensions or liquids, and its role in the case- No, but it has a sentence that says this could also be delivered in a solid form. Ah, yes. It expressly indicates that it could be delivered in a solid form. Right. We're talking about, I think, two different issues. One is, once someone has conceived of this invention and then has said, I can make a solid dosage form and not coat it with an enteric coating, would I be able, as an artisan, to make a solid dosage form? The answer is yes, that's the reference in 737. But the solid dosage form prior art, 737 being a Dr. Phillips patent, the prior art, such as the 505 Lovegren patent, it's not discussed by the district court opinion or by PAR. It says there must be an enteric coating. So, too, the 960 Bengston patent, not discussed by the district court or PAR. It must be enteric coated. The 344 DuPuy prior art- Okay, before you go on, I still don't think I fully understand your answer. So are you saying that in order to prevail, the 737 has to be deemed not to be prior art? Or are you admitting that it renders obvious claims if it is, in fact, prior art? No, what I'm focused on is the sentence the court was addressing. And the question is, if someone has conceived of the invention, as opposed to following the conventional wisdom as demonstrated in all of the prior art, the prior art whole, which taught away from Dr. Phillips' invention, but if someone, other than Dr. Phillips, Dr. No, conceived of the invention, could that person of skill in the art say, yes, I know how to make this uncoated solid dosage form? That's what Dr. Phillips' statement means. It doesn't address directly whether it would be an invention, as it was, to, in fact, come up with the uncoated form. It's surprising that these three key pieces of solid dosage art and other solid dosage art is not discussed at all by either the district court or by PARC. Now let me go to the liquid art, and that's represented principally by Pelbrant. Well, first of all, there is a major difference. It's liquid. There's no dispute that you could bombard the stomach under certain circumstances with enough sodium bicarbonate to reduce the acidity to allow some omeprazole or another PPI to enter the bloodstream. But note what's being done here is an experiment. This isn't really a dosage form for regular patients. One has to fast for 10 hours, have a pre-dosage form of ingestion of sodium bicarbonate to lower the acidity. The fasting is important because that lowers the acidity. Can I ask a question? Yes. You started with the premise that Pelbrant was a liquid. This is a dumb question, but isn't it actually a powder, and then you reconstitute it into a liquid? So doesn't it actually start very much as a solid, but then you add something to make it aqueous? Yes, but I agree with Your Honor on that. But the actual dosage form is, I'll be more precise, it's a liquid suspension. Pelbrant discusses solutions, suspensions, in this case a liquid suspension, even though one of the ingredients at the beginning is a solid, this dosage form is a suspension. And then he also goes on after the experiment to discuss different delivery forms, including solid forms, and he explicitly, quote, rules out the uncoated form that is the heart of Dr. Phillips' invention with all the other limitations and expresses a preference for a solid dosage form that is enteric coated. So even the liquid prior art is teaching away from Dr. Phillips' invention. Now the third group of the prior art, the stability prior art, the Makino and Yamasaka art, it's addressing a somewhat different problem, and both sides debate and argue how to characterize that art. I think it's fair to say that both of those references are addressing stability and the problem is the enteric coating itself is acidic and therefore tends to degrade or destroy the PPI. So that art is saying you might coat the PPI with sodium bicarbonate to increase the stability and shelf life. It is not addressing directly the question that is before this court, and that is, and I want to emphasize, it's the question of the prior art as a whole. Does the prior art as a whole teach away from Dr. Phillips' invention? It does, and I believe that what is contained in the prior art... Does it really teach away or is it just true that enteric coatings have been more successful? In fact, in the marketplace, they remain more successful, and so no one felt the need to move in another direction with the enteric coatings working so well. So I think it teaches away, and these are about the strongest teachings one could see in multiple pieces of art. Take, for example, the 505 Lovgren patent. By the way, Pilgrim is one of the co-inventors there, so it's a furtherance of his work, and it states in part, quote, the cores must be enteric coated. That's a teaching way. Take the DuPri 344 patent, prior art. It says that the PPIs, quote, must be protected from contact with acidic gastric juice by an enteric coating. Take the Benson 960 piece of prior art, and it says in part that the omeprazole, quote, must be protected from contact with acidic gastric juices. I hate to keep coming back to this, but doesn't the 737 patent actually disclose uncoded use of the drug? So even if these other references teach away, if the 737 is patent, is prior art, then doesn't it actually supply that missing link? It's teaching the invention in an uncoded form. If I accept the Court's assumptions, the answer is yes, but I want to point out that a number of the claims at issue, including a number of the exemplary claims, all of that would not be pertinent for a number of reasons. For some claims, the 737 is not prior art, and so that combination can't be used. Right, but it's a number of claims, such as the 346 claims 60. There are five claims in the 772 patent, and there was a finding that 737 was not available for a priority date because of the no-succulphrate limitation. Did you want to address that at all? I would be delighted to do so. Here's what the state of the record is. There are four kinds of treatments that are discussed in the patents. Let me call them red, white, blue, and muddy brown. It's PPIs, antacids, H2 antagonists, and succulphrate. There are criticisms of succulphrate, and then some of the claims call out a limitation, no succulphrate. I think that is sufficient on its face as written description that the inventor had in mind that part of the invention or some of his claimed inventions could include the no-succulphrate limitation. Mr. Chu, let me ask you a different question. It seems as if your case must depend on this so-called teaching away the belief that the enteric coating was essential because there certainly are enough disclosures of using bicarbonate with this acid-sensitive product. Is that correct? Is there any reason why anybody would think but for this theory that because it's acid-sensitive you have to coat it that you couldn't put it in the presence of a buffer in an acid environment and have it survive at least long enough? Is it a question of how long the active ingredient lasts in the stomach before it's absorbed? Is it a matter of rate of disintegration of the amloprazole? There's something curious about it because there is so much in the prior art which does add bicarbonate in order to buffer it to slow the disintegration. So this is the prior art and we're focused. We say there's so much. It's Pilbrandt and Lehmers. Those are the principal pieces of prior art. Some things are acid-sensitive so you put it in the presence. Now one might think, okay, I might be able to use that for a solid dosage form. But here's why it was not obvious to a person of ordinary skill. Remember that person of ordinary skill must look at the prior art as a whole and we have to ask in part the question, does it teach away from this or does it teach in this direction or is it neutral? But it's a strong teaching away. And it's not illogical. So first of all, that omniscient person of ordinary skill would read all the teaching away, all these other experiments, solid art, liquid art, and the like, and come away with a firm conclusion that it's not going to work. This is explained in a number of ways, but let me call out one piece of evidence. This is Dr. George Sachs. This is after Dr. Phillips had filed for his patent applications. He's considered to be the dean in this area of science. He expressed significant skepticism. He said, we, man, he used the word man, are asset secretors, and it's absolutely unpredictable how any one of us, how much asset we will secrete or how much we will secrete at any point in time. And he concludes that the Centaurus product formulation just won't work in man. That's a paraphrase of what he actually said. He said, the dean of this area. And from that point of view, it was not only the prior art, but the people of extraordinary skill in the area were convinced it would not work. The only way that one comes to the obviousness conclusion of the district court is to ignore the most important prior art, which was done here by the court and by Parr, and to use hindsight determinations and to use a test that two of the principal ingredients, but not all the limitations, involve sodium bicarbonate and the PPI. And the overall gist is what one could think about combining them. Is the question of teaching away one of law or fact? The question of obviousness as of … Whether or not a particular reference teaches away. I think in these circumstances, it is a question of law in the following sense. If you look at a single reference, keeping in mind that one must look at the entire body, there's no dispute about what those references say. Now, there are times in other cases, many other cases, there's some lack of clarity in a reference. But I read three references where the word must be used in a crystal clear manner. So the facts were not in dispute. To be clear, you agree, though, that teaching away is itself a question of fact, isn't it? I mean, that's what I understand our case law to say. You suggested law in this setting, but I think you mean overall the ultimate question is one of law. Yes. And this was at the end of a bench trial, so we need to defer to the district court's determinations under the clearly erroneous standard since it is factual. When a district court has ignored the most important prior art, it would be appropriate on appeal to find that there was clear error. Thank you. Thank you, Mr. Chu. The court will restore five minutes of rebuttal time for Mr. Chu, so if you give Ms. Carlin 20 minutes and she can use that if she needs it. Thank you. Ms. Carlin, you may proceed. My name is Jeanine Carlin. I'm with the law firm Aaron Fox, and I represent the appellee and cross-appellant to Parr Pharmaceutical. I'm going to start with addressing the argument on invalidity and then turn to the cross-appeal topic of inequitable conduct, reserving two minutes for rebuttal. There's been art in this field of H2 blockers and antagonists that's stretched for many, many years, and yet no one used anything other than an enteric coating for 30 years or more. If this was so obvious, why wasn't it done much earlier? The evidence in the record shows that this combination of uncoated omeprazole and sodium bicarbonate worked in the body. It was obvious. Whether or not AstraZeneca had commercial reasons But that isn't the whole invention. We have not just that combination. You have that combination in a pill form with certain prescriptions beyond that. Right. You have to deal with all of those. You do, and the prior art shows all of that. Had the prior art shown any place where you put it into a solid pill form? Yes. In fact, through obviousness, in both Pilbrandt and Lamers, showing that it works and as acknowledged by the patenting saying it's known in the art. Those are aqueous solutions. We know that. Right. And also if you look at the claim construction, that's important here because the court has construed the claims of solid formulation to include powders mixed with a liquid. So these are obvious references that render obvious the claims, even if they're starting with the powder and mixed with the liquids. That's covered by the claim construction that was advocated by appellants here and adopted by the court. So both Pilbrandt and Lamers would render obvious something that's solid. If we perceive that this is a pill form, you have to deal with the narrower claim construction then. Would that give you problems? I'm sorry. If it's a pill, not an aqueous powder solution. Yes. The invention is a pill. If you change the claim construction to be. . . Without an enteric coding, it's wrapped in tums. Okay. If you change the claim construction. . . To be a little flim. And the claims are now interpreted to be something much more narrow than it must be a tablet, for example. These references, Pilbrandt, Lamers, and also Makino and Yamasaka would render those obvious as well because it was known in the art that you could. And it was acknowledged by the patentee that it was known in the art that you could take those forms and convert them into tablets. But then you have to deal with all of the teaching away that says no. When you head into the tablet forms, you only have enteric codings. Must, must, must. Well, interestingly, turning to those particular references that use the word must, that appellants urge that the district court didn't see and did not discuss, there are three reasons why those particular references should be completely disregarded and rejected. One of them is because those references are not references that PAR is relying on at all as prior art. Number two, it's procedural. Not one witness at trial testified about those references. Well, you said those witnesses are not what you're relying on. Were they introduced? They were not introduced during the trial at all. In fact, those particular references were only referenced in the post-trial briefing. Not one expert or fact witness has testified regarding what it would teach to one of ordinary skill in the art. So here we are just with these references with the same quote taken from all of them. All of them happen to be from AstraZeneca, the company that made Prilosec and did the commercial version with enteric coding. So the patent office just really made a big mistake on this one? The patent office made a big mistake, yes. Because all of these claims are obvious in light of the prior art. Now, with respect to the three references that allegedly teach a way. Still, this is the only pill without an enteric coding. If I were a patent examiner, I'd be a little offended by your quick dismissal of their work. Right. Enteric coding is one option, and that's the way that some of the companies have commercialized them. And there's no evidence in the record as to why this would be more of a commercial reason. You can speculate that someone would want this type of dosage form as a consumer. But there's no reason shown. And even in Pilbrandt, where appellants say that Pilbrandt and AstraZeneca said, we're ruling out the liquid form, that's a mischaracterization of the reference. It's not ruling out the liquid form. It's ruling out a dosage form that is a pill that is not enteric coded. So it's looking at two different forms there, not ruling out the liquid form at all. So with Pilbrandt and Lamers and Yamasaka, these references show that it's obvious to use these two together, that omeprazole is protected by the sodium bicarbonate. And that's an important thing to note, because it's omeprazole's problem of degradation in acid that is addressed here, and the sodium bicarbonate takes care of that. Now all of these references, Pilbrandt, Lamers, and Yamasaka, and Makino, what's important is they all show that this works. Pilbrandt shows that the suspension is bioavailable in humans. The other references, like Lamers, show that it actually works to take the gastric acid down to a level that solves the problem in people with this disease. So Lamers actually shows in a clinical study that it works, and that would be a motivation for a company or someone else to actually use this particular combination. How do you deal with the secondary considerations? There seem to be a lot of them, commercial success, copying. There actually are a lot of secondary considerations that were brought into this case, but the district court had it right. The district court stated that... Start with copying for me. Copying is one of those things in a hatch-waxman case like this, that it should be given very little weight. Of course, you want to copy the exact product so you can get on the market without redoing the testing. Isn't that in itself testament to the value of the claimed invention, that you're willing to copy it because that's what brings you great value in the marketplace? You can't make that leap at all in a hatch-waxman case, because what you need to do, what the companies need to do as a generic, is have a product on the market that is bioequivalent. That's required under the FDA rules. So if it's bioequivalent... You're restating what I stated. Why is that not an indication of the value of this particular product? You've got to have that to get on the market, and you want a share of that market. If it was of no value, you wouldn't go through the process, would you? The testimony in this case showed that what PAR did was identify the low-hanging fruit. What is a drug out there that's not doing that well that we would be the only other competitor on the market? So in this case, they identified a drug that was probably not going to have much of a market share. But they wanted that market share. Isn't that a testament to its value? This is a business decision instead. The generic companies look to see what type of... is testament that the business thinks this is important enough to put out the millions of dollars they have to to go through the end of process, and you're saying that's irrelevant? In this case, it should be given little weight. Copying in all Hatch-Waxman cases should be given little weight because of the constraints of the FDA in making sure that the drug is bioequivalent. And then commercial success in this case hasn't been shown because of the small market share and also because there may be... the market share for Zagreb is less than 1%. And also, there may be some sales that are just due to pricing discounts or marketing, and there's no growth shown with this drug. So commercial success wasn't proven. But I think one of the most important things about secondary considerations in this case is that there was no nexus shown. There's no showing that there's sales or any purchases because of any features of the claims. Remember that Omeprazole itself is very successful and on the market, and that could have been the reason for any sales whatsoever. So the district court was correct when it found that the appellants did not show any secondary considerations and they failed to establish any nexus between secondary considerations and the claims. On the written description topic, in this... That's the most curious one here, isn't it? It says no sulcrophate, and then you've got a support in the specification that says it's a disadvantage. What more do you want for possession of this? First, the no sulcronate, sulcrophate itself is very possession indicative, but even beyond that, you have a reference in the specification. In the specification for the 772, the only reference is a statement in the specification that certain drugs are not as advantageous as, say, PPIs, and they include antacids. So sulcrophate, antacids, and it lists some issues with those. By showing that they know what it is, they know it has disadvantages, why doesn't that support the limitation of none of that in this claim? Here's the problem with the pointing to that as a teaching that it should not be included in the claim. That same sentence, only a few words away, is antacids, and sodium bicarbonate is an antacid, and one of the requirements in every single claim of the 772 patent is that it contains sodium bicarbonate. So appellants are trying to rely on the same sentence, which has a negative, to support what they think is a negative limitation, no sulcrophate, and at the same time where it includes an antacid, sodium bicarbonate. It's completely inconsistent, and that's the only reference that they can point to. A fact finder should figure out, though, because, I mean, you know, the specification says on one hand, none of this, and then you point out that, well, one of these other things they said none of this for also shows up in the claims. Doesn't that, I mean, isn't that really the quintessential reason why this shouldn't be done as a matter of law? It should be something a fact finder should figure out. And in this case, there is testimony from an expert who looked at the applications, who looked at the specification, and testified, I see no written, I see no support for having no sulcrophate here. So the testimony, there is factual evidence in the record that there is no support for that particular element. You point to the sodium bicarbonate, you say, well, look, they say sulcrophate is bad, sodium bicarbonate is bad, don't use them, and your explanation is, well, yes, but then they went on to use sodium bicarbonate, right? Correct. So that's the hook, the reason why, suppose that they didn't use sodium bicarbonate, suppose the entire rest of the specification didn't mention sodium bicarbonate and appeared in no claim limitation, would this be a different case? It's not a different case, because just because that one sentence says, here are some problems with these various things and proton pump inhibitors are better, doesn't show that the inventor possessed at the time, there should never be sulcrophate in this invention. It doesn't teach one, it doesn't show that that was something that could not and should not be part of the invention. So the statement in the spec that omeprazole, am I getting that one right? Omeprazole. Okay, omeprazole, statement in the spec that omeprazole and BPI's are better, don't use sulcrophate and sodium bicarbonate, don't use those, you think that statements like that that would suggest there are disadvantages to these other things, I mean omeprazole was part of the main invention here, so why aren't these statements, these teaching aways, these suggestions, don't use these other things, they're not good, why isn't that enough to show the inventor possessed not having these things appear? Even if that could be considered a teaching away from using sulcrophate to treat this disease, it's not showing that the inventor possessed having this particular claim, you meet all of these claim limitations and you must make sure that you do not include sulcrophate. So that would be, it's a question of fact. But antacids can be used as both an active ingredient and a buffer. Yes, they can. Can you use sulcrophate as a buffer? I don't know the answer to that. Well, I think it's interesting. I mean, there's an important factual finding that would distinguish sulcrophate and dismiss the argument you've been making to us for the last five minutes, and you don't know the answer. It strikes me as a pretty important reason to suggest that maybe there's at least possession here, which is a pretty low obstacle to meet anyway. I don't know if sulcrophate buffers, but I can tell you that sulcrophate works differently than antacids and buffers by being more of a cytoprotective. It basically covers the stomach and keeps it protected in a physical way. So it is different and can be distinguished from antacids. And yet they say it has disadvantages. It's different from the antacids. You're saying we ought to put in the same category. Why isn't there support? Again, there's no support. Because your antacid argument is now out because you admit it has differences. It has differences. All of the ingredients in that particular line have differences. I don't think that changes the argument, however, because the argument is that the inventor included a long list of things that he said were not so good, and yet only one of them is considered he put into the claims as a negative limitation. Another one of those ingredients he included as a positive limitation in the claims. Therefore, it doesn't support that he had possession. That one line does not support possession. But I'd like to, in the time that I have remaining, return to the cross appeal on inequitable conduct. And in this case, the cross appeal is very straightforward. It is essentially a legal issue here, because the district court found that the inventor, Dr. Phillips, and his patent attorney, Mr. Mahoney, failed in their duty of disclosure, and they failed to disclose material information to the patent office. The clear and convincing evidence showed, as the court found, that Dr. Phillips publicly and repeatedly disclosed his prior uses to the inventor. That is where the court made the distinction. The court made the distinction on the lack of intent. Even if it was incredibly material, the court said there's no intent to deceive. That's where the court erred. The court found that there were those failures. He also found that there was no credible explanation for the failures to disclose. So basically, what the district court was compelled to do at that point was to find there was deceptive intent as the single most reasonable inference for these actions. The court didn't hold that way. Effectively, what the district court has done is required a very high standard where there must be some sort of affirmative direct evidence, where, for example, there's a confession by Dr. Phillips saying, I intended to deceive the patent office. I intended not to. That isn't quite what the court found. The court found that there was no intent to conceal it, that he did the experiments openly, and that he believed, as he testified, and I think the court believed him, that since there was nothing published, that this was a treatment within a hospital that was being worked on, that he didn't intend to conceal it. The court found, by listening to the testimony of Dr. Phillips and Mr. Mahoney, that their testimony strained credibility, that their explanations for not disclosing seemed unlikely. He said that it was close. At the same time, he did not find deceptive intent. It may have been a close finding that he made, but he still came out on the side in which he came out. Now, where is the flaw in that? The flaw in this is that we have clear, convincing evidence that there were failures to disclose material information, that these uses were not confidential, even though Dr. Phillips told the patent office later that they were confidential. They were never kept confidential. Well, we're assuming then, we're assuming it's material. In fact, it was because of the timing and because of the nature of the disclosure, but the court assumed it was. So let's talk about the intent aspect. Well, we also have other evidence that do lead towards intent, and that is that Mr. Mahoney, the patent prosecutor, who was also the one in charge of licensing these patents, had shopped around all of these patents to various companies, and only once he had a licensee, Santeros, and a million-dollar payment and half a million shares of Santeros stock, then he disclosed to the patent office all of these prior uses that Dr. Phillips had made. This is commercial. He came new into the scene. He thought a mistake had been made and that it should have been disclosed, and so he disclosed it. Now, what are we to make of that? I make of it that he disclosed it after a long period of time and at a certain point of time where you can look to it as commercial motivation, that the commercial aspect of it can go to intent. All of the fact finding, and we have to review it for clear error, and you're suggesting one interpretation of the fact, and Judge Newman is suggesting another, and, you know, we don't review it to no vote. We give deference to these fact findings. And the fact findings are that everything leading up to this shows that they're a failure to disclose, that they knew that the materiality is there. There's no credible explanation. Even though they had explanations, they weren't credible. So all of that evidence should be enough to find inequitable conduct, and this is reversible error. I'd like to reserve my last minute, please. Thank you. Thank you. You may. Mr. Chu, we gave you five minutes. You may proceed. I want to focus on the first and most important argument of opposing counsel. Opposing counsel on the question of obviousness said, ignore the most important prior art that deals with solid dosage forms, first, because they're not relying on it. Well, that's not what the law is. The law is that one must look to the prior art and the teachings of the prior art as a whole, and the challenger to a patent doesn't get to pick and choose what prior art constitutes that body of prior art with teachings. Was the 505 patent introduced in the bench trial, for example? Yes. It was introduced before the judge as part of the body of prior art? Yes, and so were the other two patents I cited, as well as other prior art that relates to the same issue. There was a statement by opposing counsel that there was no testimony. I'm fairly sure there is testimony in a number of places, but let me cite one place we were able to find in the last minute. It's at A761762. Dr. Fennerty is the expert witness for Santaris. He's not referring to these patents, these three by their actual name. He's using slides. He's referring to later patents. They're still prior art, but his discussion of it makes clear that he's referring to these patents that state that the PPI must be enteric coded. There is no explanation, and Parr offers no reasonable explanation, as to why the most important body of prior art was completely ignored by the district court. Now, if this court agrees that that is a flaw in the district court's opinion, we believe that this court may simply reverse as opposed to reversing and remanding. The reason is the facts are not in dispute. We see the pieces of prior art. We know the words in their four corners. There's nothing subject to interpretation of those words in this case, so there ought to be a reversal. Thank you. That's all, Mr. Chu. Ms. Carlin, I didn't hear him argue anything about inequitable conduct, so I think we're finished. Thank you.